CJL
11-9-18

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2018 DEC 19 PM 4: 17

CLERK'S OFFICE
AT BALTIMORE

BY _____ DEPUTY



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

| | | |
|---|---|---|
| Christina A. Hoffman<br>Assistant United States Attorney<br>Christina.hoffman@usdoj.gov | | Suite 400<br>36 S. Charles Street<br>Baltimore, MD 21201-3119 | DIRECT: 410-209-4871<br>MAIN: 410-209-4800<br>FAX: 410-962-3124 |

November 8, 2018

Christopher Carlos Nieto
Law Office of Christopher C. Nieto, LLC
231 E. Baltimore Street Suite 1102
Baltimore, MD 21202

Re:  United States v. James Hair, a/k/a Mook,
     Criminal No. JKB-18-0204 (D. Md.)

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, James Hair, a/k/a "Mook" (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by November 23, 2018, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offense of Conviction

1. The Defendant agrees to plead guilty to Count One of the Indictment, which charges the Defendant with possession with conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846. The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

### Elements of the Offense

2. The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the Indictment, in the District of Maryland:

  a. an agreement existed between two or more persons to violate the drug laws of the United States by distributing or possessing with the intent to distribute cocaine, cocaine base, heroin, and fentanyl;

  b. that the Defendant was a party to, or member of, that agreement;

  c. that it was foreseeable to the Defendant that the conspiracy would distribute 500 grams or more of cocaine; and

  d. the Defendant knowingly entered into that agreement.

Penalties

3. The maximum penalties provided by statute for the offense(s) to which the Defendant is pleading guilty are as follows:

| COUNT | STATUTE | MAND. MIN. IMPRISON-MENT | MAX IMPRISON-MENT | MAX SUPERVISED RELEASE | MAX FINE | SPECIAL ASSESS-MENT |
|---|---|---|---|---|---|---|
| 1. 2 | 21 U.S.C. § 846 | 5 years | 40 years | 4 years | $5,000,000 | $100 |

  a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

  b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment up to the entire original term of supervised release if permitted by statute, followed by an additional term of supervised release.

  c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

  d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

  e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

  f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is

nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

### Waiver of Rights

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

    a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

    d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By

pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.     By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g.     If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h.     By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5.     The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.     a.     This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein. This Office and the Defendant further agree that the applicable base offense level is a **level 26** pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2D1.1(c)(7) because the offense involved between 2 kilograms and 3.5 kilograms of cocaine.

     b.     There is a **two-level increase** in the Defendant's offense level pursuant to U.S.S.G. § 2D1.1(b)(1) because the Defendant possessed a firearm in connection with the offense.

     c.     This Office does not oppose a **two-level reduction** in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **one-level reduction** in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7.     The parties stipulate and agree that the Defendant's criminal convictions result in a criminal history score of eight, establishing a **criminal history category of IV**. Therefore, the advisory Guidelines range is **84 to 105 months of imprisonment**.

8.     Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9.     At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Waiver of Appeal

10.     In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

     a.     The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground

that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s).

b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

(i) The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

(ii) This Office reserves the right to appeal any sentence below a statutory minimum.

c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Forfeiture

11. a. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

b. The Defendant agrees to consent to the entry of orders of forfeiture for the property described in the two above subparagraphs and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

c. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

d. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable,

statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

### Defendant's Conduct Prior to Sentencing and Breach

12. a. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

   b. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

### Court Not a Party

13. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

14. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Robert K. Hur
United States Attorney

By: *Christina Hoffman*
Christina A. Hoffman
Peter J. Martinez
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

11/29/18
Date

James Hair

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

11/29/18
Date

Christopher Nieto, Esq.

8

## ATTACHMENT A

## STIPULATION OF FACTS

The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.

In late 2016 and early 2017, the Defendant was intercepted during a court-authorized wiretap investigation led by the Federal Bureau of Investigation (FBI). The target of the investigation was Deandre Dorsey, a/k/a "Stunna," a heroin distributor and member of the Black Guerilla Family gang (BGF). The Defendant, who was using telephone number (470) 422-6390, was intercepted in numerous wiretap calls with Dorsey in which they discussed drug trafficking, firearms, and violence.

For instance, in a wiretap call on December 26, 2016 at approximately 10:00p.m., the Defendant asked Dorsey to supply him with "like two, three Grim Rolls"—coded language for a quantity of narcotics. In a wiretap call on January 18, 2017 at approximately 10:21a.m., Dorsey told the Defendant he would give him "a five piece"—*i.e.*, five grams of heroin. In a wiretap call on January 18, 2017 at approximately 11:16p.m., the Defendant asked Dorsey to give him a "six piece"—*i.e.*, six grams of heroin. In a wiretap call on January 22, 2017, at approximately 10:37a.m., the Defendant told Dorsey that he had "a guy" who needed "a 28 piece"—*i.e.*, 28 grams of heroin—and that the same individual had a "4 nickel Ruger that he wants ten for"—*i.e.*, a Ruger firearm that he wanted to exchange for ten grams of heroin. The Defendant also told Dorsey that drug customers were complaining that they should "stop stepping on it so much"—*i.e.*, dilluting the purity of the heroin with adulterants.

On February 5, 2017, the FBI seized a cell phone belonging to an associate of the Defendant's named Marquise McCants a/k/a "Digga." The cell phone contained text messages with phone number (470) 422-6390, which was saved in McCants' phone as "Mook" (*i.e.*, the Defendant). In a text message exchange on January 30, 2017, the Defendant and McCants discussed a plot to rob and kill the Defendant's cocaine supplier. Specifically, the Defendant wrote, "tryn think of a master plan bro down to my last couple hundred bro." McCants replied, "Damn fr wat u got in mind." The Defendant stated, "This nigga I be getting the c from yo we got to fix him bro." The Defendant added, "But yo he say he get back straight tomorrow it's always no less than 18 and he going let me in bro." McCants stated, "Ok then we blitz him wipe him n dip." The Defendant stated, "Yea u got to be on standby bro." The Defendant added, "Bro I'm seriouse bro fuck yo bro I got the whole lot lay out." McCants replied, "I knw yo im serious to my nigga put yo together im a wipe em guaranteed." The Defendant replied, "Ard that's stamped bro."

9

On February 5, 2017, at approximately 7:38p.m., an associate of the Defendant's named Douglas Brooks Jr. who was incarcerated at the Maryland Reception Diagnostic Classification Center made a recorded jail call to the Defendant on telephone number (470) 422-6390. During the call, the Defendant informed Brooks that he had seen "Cliff"—known by investigators to be Khalil Matthews—and had provided a firearm to a friend of theirs named "Marty" because "Marty" had gotten into a fight with someone. Specifically, the Defendant stated, "I seen Cliff last night." Brooks asked, "Where the fuck you see him at?" The Defendant responded, "Him and Marty was getting money ... and he got into it with somebody from the projects. He needed a jimmy mac, so I took him one of the ones I had."

Roughly a month later, on March 9, 2017, Khalil Matthews a/k/a "Cliff" was shot to death in the 3400 block of Saratoga Street in Baltimore. In a wiretap call shortly after Matthews' death, the Defendant and Dorsey talked excitedly about getting revenge for their friend's murder. The Defendant stated he was going to "let them bitches have it." In a subsequent wiretap call at approximately 10:00p.m., the Defendant told Dorsey that "Cliff" (*i.e.*, Matthews) had "a spot" where he was keeping "five" or "six of them"—a reference to five or six firearms. Dorsey said, "There's never supposed to be one person with everything. Man, you know better than this. If something happened to me, Tricky got access to everything." The Defendant said, "Yeah, but listen, he had a spot where he was keeping them at, you feel me, and all I got is Bertha"—a reference to a particular firearm in the Defendant's possession. Dorsey replied, "We got to get them back. I'm stressed out right now. We gotta go put some work in, man." The Defendant said, "Yeah, we is!" Dorsey asked, "Alright, well, when, tonight?" The Defendant said, "Yeah, we going right now! That's why we need you to come out." Later in the call, the Defendant asked, "Hey bro, yo listen, do you got an extra one for BM here?" Dorsey said, "Do I got a extra one? What you doing—it don't matter how many you got; we got one, we golden. It's over." The Defendant told Dorsey, "They say two of them niggas hit bro, yo, at the same time." Dorsey replied, "Man, I don't give a fuck if it was all .... we ready to go, we ready to go kill them up there." The Defendant replied, "Already. That's what I'm talking about."

In a wiretap call on March 14, 2017 at approximately 6:00p.m., the Defendant told Dorsey that "Yo was out yesterday"—a reference to the individual he believed had killed Matthews. Dorsey asked, "What happened?" The Defendant explained, "By the time I come all the way to the castle and get Bertha ... he jumped in the car." He added, "Them niggas be out, bro. We got to spend that bitch, man." Dorsey replied, "We gonna spend him. ... He gonna be done. ... He ain't going to make it to the funeral, I can tell you that." Later, Dorsey asked, "We got some vehicles we can move in?" The Defendant replied, "That's what BM was saying, man. He was going to holler at you, you and him might gotta go half, grab a little four, five-hundred dollar." Dorsey said, "We gotta have vehicles. We have the vehicles ... just do him dirty." The Defendant said, "A nigga be damned if niggas gonna be acting like niggas smoked our man and ... shit. That wasn't just no average homeboy; that's like, that's family." Dorsey said, "Oh yeah, it's going to be some souls behind that." The Defendant said, "I told BM, I know one of them niggas gonna try to ... come to that funeral, yo. I'm a ice they ass, bro." The Defendant added that he was going to attend Matthews' funeral "with that big strap on me"—a reference to a firearm. Later, the Defendant complained that Matthews' "baby mother" would not give them

10

the six "hammers" (*i.e.*, firearms) that Matthews had stashed at her spot. Dorsey said, "Listen, shorty, if you ain't ready to send no bullets in no humans and take no souls man, that's what we ready to do." The Defendant said, "Yeah." Later, the Defendant informed Dorsey that the person who killed "Cliff" was "quick on his feet" but that "he don't be strapped outside." Dorsey said, "Once I see that bitch, it's over." The Defendant said, "I'm talking about whoever out there, it don't matter."

In a wiretap call at approximately 6:14p.m. that day, Dorsey said, "Them niggas gonna get caught wherever they at, bro. The gas station, wherever. . . . All that plotting that shit out—niggas gonna die, that's it." The Defendant replied, "Yeah, bro, that's what I'm saying." Dorsey said, "We need a car, yo, 'cause if we see him, I'm the type, I'm gonna jump out." The Defendant said, "Yeah, I'm with you. Shit." Later, Dorsey said, "I got to get my pump. He ain't gonna have no face, yo. . . . He did my man dirty. I can't stop thinking . . . he getting his face knocked off. That's on my kids." The Defendant replied, "How do you think I feel every day looking at this picture with me, you, and him? . . . Yeah bro, we got to put on for him, bro, for real, bro. We got to, yo." Dorsey said, "We are going to put on for him, bro. . . . No turning back. It's getting ugly."

On April 4, 2017, FBI agents executed a search warrant at the Defendant's residence at 1303 Greenmount Avenue, Apt. 209, Baltimore, Maryland. During a search of the residence, they recovered approximately 189 grams of cocaine, approximately 9 grams of crack cocaine, and a digital scale with suspected cocaine residue. The Defendant possessed the cocaine and crack cocaine for the purpose of distributing it.

On November 29, 2017, at the direction of the Washington County Narcotics Task Force, a confidential informant ("CI-1") conducted a controlled purchase of approximately 1.61 grams of cocaine from the Defendant in Hagerstown, Maryland while wearing an audio-video recording device. The Defendant was arrested immediately following the controlled purchase. A search of the Defendant's person incident to his arrest resulted in the recovery of two cell phones.

On March 19, 2018, at the direction of the FBI, a second confidential informant ("CI-2") met with the Defendant in Baltimore, Maryland while wearing an audio-video recording device. During the meeting, the Defendant indicated that he was trying to get his phone back from law enforcement custody because he had been making $8,000 in drug sales per day using the phone.

On April 11, 2018, at the direction of the FBI, CI-2 conducted a controlled purchase of approximately 13.72 grams of cocaine from the Defendant in Baltimore, Maryland while wearing an audio-video recording device. The Defendant brought CI-2 to a residence in Douglas Homes to obtain the cocaine. Inside the residence, CI-2 was introduced to an unknown associate of the Defendant's who was armed with a firearm. The Defendant stated that he liked the firearm due to its ability to function without jamming.

11

The Defendant admits that he conspired to distribute cocaine, cocaine base, heroin, and fentanyl, and that it was foreseeable to him that members of the conspiracy would distribute between 2 kilograms and 3.5 kilograms of cocaine.

SO STIPULATED:

*Christina Hoffman*
Christina A. Hoffman
Assistant United States Attorney

James Hair,
Defendant

Christopher Nieto, Esq.,
Counsel for Defendant